Hancock, Jr., J.
(dissenting). This case involves the constitutional limits on the reach of gubernatorial power, not the relative merits of nuclear power, the wisdom of a nuclear-oriented national energy policy, or whether the Shoreham nuclear power facility should be decommissioned.[1] The critical *418 issue is whether the Governor, purporting to act under the authority of the LIPA statute, has effectively overruled that statute and defeated its very purpose by:
(1) directing that LIPA acquire Shoreham in disregard of the statute’s specific provisions making LIPA’s authority to acquire any part of the LILCO property conditional on LIPA’s replacing LILCO as the public utility on Long Island and being able to furnish power at lower rates;
(2) failing to fulfill the statutory aim of providing a public authority as the source of power on Long Island; and,
(3) countermanding the legislative policy of substituting public for private power on Long Island with an agreement to "bail out” the existing private power company and to perpetuate its operation as the power provider on Long Island.
Because the central issue is whether the Governor acted in excess of his lawfully delegated authority, the decision necessarily has serious implications for the formulation and implementation of policy in State government and the doctrine of separation of powers (see, e.g., Matter of Campagna v Shaffer, 73 NY2d 237, 242; Boreali v Axelrod, 71 NY2d 1, 14; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344; Clark v Cuomo, 66 NY2d 185, 189; Matter of Nicholas v Kahn, 47 NY2d 24, 30; Rapp v Carey, 44 NY2d 157, 163; Matter of Broidrick v Lindsay, 39 NY2d 641, 645-646). No one suggests that the Governor’s actions were a proper exercise of executive authority under the powers granted generally in article IV of the State Constitution. The Governor acted properly, the majority maintains, under power expressly delegated to him by the Legislature in the LIPA statute (Public Authorities Law §§ 1020 — 1020-hh). The categorical position of the dissent is that there is no such authority in the LIPA statute and that, moreover, the 1989 "Settlement Agreement” and the actions which it mandates are in direct violation of the LIPA statute.
The detailed analysis of the specific provisions of the statute in part I of this dissent, infra — particularly the analysis of the critical subdivisions (1), (2) and (10) of section 1020-h (infra, at 422-426) which the majority has not challenged — proves that the majority’s interpretation flatly contradicts specific language in the statute and the underlying purpose and policy set forth in the legislative declarations and manifested in the statutory scheme and relevant legislative history.
The majority opinion contains no analysis and refers to no *419 specific language or portion of the statute or of the legislative history supporting its interpretation. Rather, it simply reaches its conclusion by assuming the validity of the following three propositions which the statutory language refutes:
(1) that the closing of Shoreham was one of the statute’s two independent primary aims and that "[t]he language of the Act and its legislative history cogently portray the Act’s objectives: LIPA’s acquisition and closure of Shoreham, or LIRA’S takeover and replacement of LILCO as a utility provider” (majority opn, at 411 [emphasis added]);
(2) that despite the statutory language (see, § 1020-h [1], [2], [10]) making acquisition of any part of the LILCO property (including Shoreham) specifically contingent on LIRA’S replacing LILCO as the Long Island utility provider, LIRA is, nevertheless, authorized to acquire Shoreham alone without taking over from LILCO as the utility provider (see, majority opn, at 407, 409, 411); and
(3) that although LIRA is not an agency of the State but an independent corporate entity created under the Public Authorities Law to furnish electricity, and although the statute lacks any language suggesting otherwise, LIPA should, nevertheless, be viewed as an administrative agency of the State endowed by the Legislature with "the power and flexibility” (majority opn, at 410) to make "policy choices” (id.) in the "complex” field of "nuclear power regulation” (id., at 410) and that the "intricate nuances of the policy determinations required under the LIRA Act deserve some respect from the Court” (id.).
Any reading of the statute and its history compels conclusions (diametrically opposed to those reached by the majority) that:
(1) the goal of the LIRA statute is to substitute publicly furnished power for private power on Long Island, and that closing Shoreham is entirely incidental to and dependent upon the achievement of that goal;
(2) LIRA’S exercise of discretion to acquire "all or any part” of LILCO is expressly contingent on LIRA’S replacing LILCO as the utility supplier on Long Island, and that the transfer of Shoreham to LIRA while LILCO remains as the utility provider on Long Island is not authorized by the statute and, indeed, is contrary to it;
(3) LIRA is not an administrative agency of the State and has no authority to make rules or policy choices "consistent *420 with the enabling legislation” (majority opn, at 410) like the executive departments in the cases, cited by the majority (majority opn, at 410) — e.g., Boreali v Axelrod (71 NY2d 1 [Department of Health]), Matter of Nicholas v Kahn (47 NY2d 24 [Department of Public Service]), Matter of Bates v Toia (45 NY2d 460 [Department of Social Services]). LIPA is an independent public corporation created under the Public Authorities Law having the general powers that are typically given to public authorities (§ 1020-f) and the specific powers "to provide and maintain generating, transmission and resource recovery waste to energy facilities” (§ 1020-g) including significantly the following:
"After the establishment of Long Island Power Authority (LIPA) and the commencement of its function as a utility, LIPA shall acquire from LILCO all franchise and utility service responsibilities for all ultimate consumers of gas and electricity within LILCO’s former service territory, including the responsibility to provide safe and adequate service” (§ 1020-g [n] [emphasis added]).
To be sure, the public authority is given the limited discretion necessary to carry out its corporate purposes (e.g., to negotiate terms of purchase [§ 1020-h (2)], to determine amount of tender offer [§ 1020-h (3)] or to commence a taking by eminent domain [§ 1020-h (4)]). But, it is inconceivable that by giving LIPA its charter the legislators could have intended to set in motion an uncontrollable public entity with sufficient autonomy to subvert the very purpose for which they created it and to violate their express mandate making acquisition of any part of the LILCO property contingent on LIPA’s becoming the power provider. How the majority’s theory can be adopted without attributing such remarkable intention to the legislators is not explained.
The Governor’s action in implementing the "Settlement Agreement” is an assertion of unauthorized executive power and a usurpation of legislative authority in sharp conflict with the doctrine of separation of powers which we have emphatically reaffirmed as a vital principle in New York jurisprudence (see, Under 21 v City of New York, supra, at 355-356). I, therefore, dissent on this ground.
I agree, moreover, with the arguments advanced by the United States Attorney on behalf of the United States and by other appellants that the "Settlement Agreement” insofar as *421 it calls for the decommissioning of Shoreham without SEQRA review, must be vacated as an invalid action (see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 368-369).
Any reasoned discussion of the constitutional and separation of powers issues must start with a description of the LIPA statute and a comprehensive analysis of the statute’s purpose and underlying policy and of the relevant legislative history.
I
A. The Crisis
The LIPA Act and the movement to replace the Long Island Lighting Company (LILCO) with a public power authority arose out of increasing concern for the reliability and affordability of electric power on Long Island. Rapidly escalating rates, excessive costs, insufficient power supply, and the economic ruin of LILCO were serious threats to the Long Island economy (see, Public Authorities Law § 1020-a; Assembly Mem, Bill Jacket, L 1986, ch 517, at 13). Although the environmental and financial problems posed by Shoreham initiated the public concern, the focus of that concern was on LILCO’s mismanagement and unresponsiveness to the public which caused many to "view LILCO as having breached its public trust and no longer deserving of exercising its monopoly electrical and gas franchise” (Assembly Mem, id., at 14; see also, Governor’s Mem, id., at 15; Budget Report on Bills, id., at 5). In 1986, the Governor and the Legislature approved funding of the "Sawhill Report” on "[t]he specific means by which public power could be implemented on Long Island” as "one mechanism which could provide substantial benefits to ratepayers on Long Island” (Governor’s Approval Mem, id., at 12). Throughout the drafting and approval of the statute, replacement of LILCO by a public authority remained the objective (see, e.g., Mem of New York State Energy Office, id., at 39 ["The Authority (LIPA) would be created for the purpose of acquiring the assets or securities of the Long Island Lighting Company (LILCO) and providing electric and gas service in the franchise area currently served by the company”]; Attorney-General’s Mem, id., at 9-11 ["The purpose of the bill is to create a non-profit corporate instrumentality of the State * * * which is mandated to employ the most cost-effective method of acquiring LILCO * * * Under LILCO, Long Island’s electric rates will remain inordinately high whether or not *422 Shoreham opens * * * Clearly, drastic relief is needed, and this bill will put Long Island on a new course.”]). Indeed, in his Approval Message, the Governor stated:
"Replacement of LILCO with a public power authority is designed to resolve the problems caused by LILCO’s imprudence and mismanagement, to operate LILCO’s system more reliably, safely, efficiently and economically * * * and to place control of LILCO’s system in the hands of elected representatives of the ratepayers” (1986 NY Legis Ann, at 242 [emphasis added]).
That the replacement of LILCO by LIPA as the power provider is the only solution offered by the Legislature to the crisis on Long Island and is the aim of the LIPA statute is made clear in the Legislature’s own statement of the statute’s objectives and purposes. Section 1020-a, "Declaration of legislative findings and declarations”, states:
"Constantly escalating and excessive costs of electricity * * * pose a serious threat to the economic well-being, health and safety of residents of and the commerce and industry in the service area * * *
"Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority * * * In such circumstances, such an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result * * * realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area. Moreover, in such circumstances the replacement of such investor owned utilities by such an authority will result in an improved system and reduction of future costs and a safer, more efficient, reliable and economical supply of electric energy” (Public Authorities Law § 1020-a [emphasis added]).
B. The Legislative Solution
The statutory policy of section 1020-a is fulfilled by the mandates in the subsequent sections of the statute. Under section 1020-c, the newly created LIPA is a public corporation *423 created under the Public Authorities Law to be operated only on a not-for-profit basis in the area previously serviced by LILCO (see, §§ 1020-c, 1020-b [17]). LIPA is granted powers by section 1020-g necessary to fulfill its corporate purpose, the generation and transmission of electricity. Upon LIPA’s commencing operation, section 1020-g (n) provides that "LIPA shall acquire from LILCO all franchise and utility service responsibilities for all ultimate consumers” (emphasis added).
LIPA is empowered to acquire LILCO stock and assets pursuant to section 1020-h. Of central importance to the acquisition and replacement of LILCO by LIPA is section 1020-h (2):
"In furtherance of the legislative findings and determinations set forth in subdivision one of this section, the authority is hereby authorized and empowered to acquire, through purchase or the exercise of the power of eminent domain, all or any part of the securities or assets of LILCO, as the authority in its sole discretion may determine; provided, however, that prior to proceeding with any such acquisition under this title, the board shall determine * * * that the rates projected to be charged after such acquisition * * * will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred” (emphasis added).
Although this section vests LIPA with discretion to acquire "all or any part” of LILCO, the exercise of that discretion is expressly contingent and qualified as set forth in the following significant provisions.
Any exercise of discretion under section 1020-h (2) in acquiring any part of LILCO must be "[i]n furtherance of the legislative findings and determinations set forth in” section 1020-h (1) (emphasis added). Under section 1020-h (1), the Legislature "expressly finds and determines” that:
"(a) The acquisition by the authority * * * of either the securities or assets of LILCO * * * is the most appropriate means of dealing with the emergency * * * in the service area”;
and,
"(b) The authority, prior to exercising its power of eminent domain to acquire stock or assets of *424 LILCO, shall enter into negotiations with LILCO for the purpose of acquiring such stock or assets upon such terms as the authority, in its sole discretion, determines will result in rates equal to or less than the rates which would result if LILCO were to continue in operation.”
Thus, in the foregoing provisions it is unequivocally specified that the only purpose for which LIPA may exercise its acquisition authority (§ 1020-h [2]) is one which furthers the replacement of LILCO by LIPA and results in utility rates "equal to or less than the rates which would result if LILCO were to continue in operation”.
Moreover, the language following the phrase "provided, however,” makes any acquisition of LILCO property contingent upon the LIPA Board’s first determining that after the acquisition, the projected rates "will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred” (emphasis added).
If there can be any doubt remaining that the statute makes LIPA’s discretion to acquire any part of LILCO’s property conditional on LIPA’s replacing LILCO it is removed by section 1020-h (10):
"If the authority determines, in its sole discretion, that the total cost of acquisition will result in rates in excess of the rates which would result from continued operation by LILCO, the authority shall abandon the acquisition” (emphasis added).
If the cost to LIPA of exercising its acquisition discretion would subsequently prohibit LIPA from charging lower rates, then LIPA must abandon its acquisition plans (§ 1020-h [10]).
It must be emphasized that the majority does not attempt to support its assertions that the statute somehow envisions LILCO (not LIPA) as the power provider after acquisition (see, e.g., majority opn, at 407, 409, 411) by reference to or analysis of any statutory provision. The reason is clear. The statute (§ 1020-h [1] [b]; [2], [4], [10]) rules out any possibility that LILCO and not LIPA could have been envisioned as the power provider after acquisition. That this is so is not a conclusion based on "negative inference” (majority opn, at 412), but the unequivocal mandate of express statutory provisions. Only LIPA was intended to be the power provider. Both section 1020-h (1) (b) and (10) refer to the effect that "cost of acquisition” (i.e., of LILCO by LIPA) will have on rates to be charged *425 after acquisition by LIPA. Section 1020-h (1) (b) and (10) provide that if the terms of acquisition "will result” in rates in excess of "the rates which would result if LILCO were to continue in operation” (§ 1020-h [1] [b] [emphasis added]), then the acquisition is not to go forward. The "cost of acquisition” (§ 1020-h [10]) and of "acquiring” (§ 1020-h [1] [b]) could only be a cost borne by LIPA, the acquiring entity. The effect of such cost on rates could only refer to the rates to be charged by LIPA as power provider after acquisition. Indeed, any construction of the statute linking cost of acquisition to rates to be charged after acquisition by LILCO, the acquired entity, would render the statute absurd and must be rejected (McKinney’s Cons Laws of NY, Book 1, Statutes § 145).[2]
It is significant that, in previous Federal litigation construing the LIPA statute, LIPA itself argued that the acquisition and decommission of Shoreham is preconditioned on its replacement of LILCO as the power provider (see, Long Is. Light. Co. v Cuomo, 666 F Supp 370 [ND NY 1987, Munson, Ch. J.], appeal dismissed and judgment vacated 888 F2d 230 [2d Cir 1989]). LIPA argued to the District Court[3] that:
"Finally, LILCO challenges § 1020-h(9) which provides that LIPA shall close Shoreham 'as soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO pursuant to this title’ * * * LILCO’s allegation that § 1020-h(9) would unconstitutionally deprive it of its property ignores the fact that the subsection has no effect unless and until LIPA either owns all of LILCO’s property or is the controlling shareholder of LILCO” (emphasis added)
*426 and to the Second Circuit that:
"In short, § 1020-h(3)(b) rationally advances the Legislature's objective of establishing a public authority to replace LILCO by insuring that LIPA can promptly merge with LILCO if two-thirds of the outstanding LILCO common shares — the percentage required to approve any BCL merger — are tendered” (emphasis added).
C. The Settlement Agreement
Subsequent to the passage of the statute, the newly formed LIPA attempted unsuccessfully to acquire LILCO by tender offer as authorized by section 1020-h (3) and LILCO brought an action in Federal court challenging the constitutionality of the statute (see, Long Is. Light. Co. v Cuomo, 666 F Supp 370 [ND NY 1987], appeal dismissed and judgment vacated 888 F2d 230 [2d Cir 1989], supra). In 1988 LILCO, LIPA, Governor Cuomo, and others reached an agreement settling the Federal court litigation and other actions — the 1988 Settlement Agreement. Because the Agreement required legislative approval before becoming effective, Governor Cuomo called the Legislature into special session to ratify the Agreement. The Legislature, however, voted not to ratify the Agreement. According to Assembly members, the Agreement "undercut the Legislative intent of the passage of the Long Island Power Authority Act” to replace LILCO with a public power authority. The 1988 Agreement was subsequently modified and reexecuted, in substantially identical form, as the 1989 Settlement Agreement at issue in this case but did not expressly require legislative approval. The Legislature, however, again refused to pass the requested legislative approval thought to be necessary for the performance of the agreement.
Although the policy of the LIPA Act was to replace LILCO, the Settlement Agreement does the opposite: it retains LILCO, a privately owned company, and calls for publicly financed measures to save it from economic ruin. The Agreement states that "the parties intend that LILCO be returned to investment grade financial condition as an investor-owned electric and gas corporation”. All litigation between LIPA and LILCO would be discontinued except that each action may be reinstated "in the event LIPA attempts to acquire an interest in LILCO by any means” (Settlement Agreement). In addition, LILCO would transfer the Shoreham facility to LIPA for $1 *427 and in return LILCO would be the beneficiary of several financial recovery commitments. These include:
1. Guaranteed rate increases of 5% in 1989 and 1990, and projected increases of 4.6% each year through 1999 (see, PSC Opn No. 89-8);
2. A minimum of $100 million per year of State Industrial Development Bonds for a minimum of five years (see, 1989 Settlement Agreement);
3. Commitment that the New York Power Authority, at LILCO’s request, will construct and operate three power generation facilities and provide LILCO with additional power transmission facilities (see, Amended Mem of Understanding Concerning Proposed Agreements);
4. Commitment that LILCO’s annual electric rates will be calculated to "enable LILCO to become current on all preferred dividends * * * and to resume payment of common dividends” at $1 per share in 1989, $1.50 per share in 1990, and $2 per share in 1991 (see, Settlement Agreement; see also, Lazard Freres Study);
5. Commitment that LILCO’s annual electric rates will be adequate for the establishment of a "Financial Resource Asset” having a Base Financial Component sufficient to "restore LILCO’s General & Refunding Debt to an investment grade rating (Baa 3 by Moody’s or BBB by Standard and Poors at a minimum)” (id., at § 2 [d]);
6. Realization by LILCO of a $2 billion "deductible abandonment loss” for Federal income tax purposes as a result of its transfer of Shoreham to LIPA for $1 while the nuclear power facility is being decommissioned (see, IRS Priv Ltr Rul 8,850,016; see also, Statement of Trustee Kidder);
7. Commitment to retransfer the Shoreham real estate to LILCO for $1 after the decommission of the nuclear power facility (see, Amended and Restated Asset Transfer Agreement).
D. The Settlement Agreement is not Authorized
The Settlement Agreement thwarts the statutory policy of providing public power on Long Island by initiating, instead, a publicly financed resuscitation of LILCO. The acquisition of *428 Shoreham alone and without any provision for the replacement of LILCO as power provider flatly contravenes the statutory language conditioning the exercise of LIPA’s discretion to acquire "all or any part” of LILCO on the replacement of LILCO. Unlike the majority, we can find no authority in the LIPA statute for this financial rescue of a private corporation at the expense of the taxpayers and ratepayers. The majority apparently finds such authority under its "liberal construction” (majority opn, at 410) of the statute to insure that Shoreham is not operated, even though the parties concede that the dismantling steps already taken are "irreversible” (see, dissenting opn, n 1, supra). Indeed, the Legislature has twice refused to condone such a construction (see, supra, at 426).
This executive action implementing the Settlement Agreement cannot be cast as somehow being within the discretion broadly delegated to an administrative agency dealing with the technical field of nuclear power regulation (see, majority opn, at 410). LIPA is not an administrative or regulatory agency, but an independent public corporation organized under the Public Authorities Law (see, Matter of New York Post Corp. v Moses, 10 NY2d 199, 203-204; see generally, 87 NY Jur 2d, Public Authorities, § 1). For the same reason, no basis exists for suggesting (majority opn, at 410, 411, 412, 413) that the action deserves the sort of deference sometimes accorded to agencies in interpreting the statutes they are charged with administering (cf., Matter of Memorial Hosp. v Axelrod, 68 NY2d 958).
Some of respondents have suggested that more than ordinary deference should be given to the "Settlement Agreement” on practical grounds or because they claim it is the "best deal” that could be worked out. Unstated but necessarily subsumed in such suggestions is the proposition that there may be times when the ends do justify the means, even those not permitted by the law. There can be no more effective response to just such appeals to expediency than that given by Mr. Justice Robert Jackson in Youngstown Co. v Sawyer (343 US 579):
"The Executive, except for recommendation and veto, has no legislative power. The executive action we have here originates in the individual will * * * and represents an exercise of authority without law * * * With all its defects, delays and inconveniences, men have discovered no technique *429 for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
"Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up” (Jackson, J., concurring opn, at 655).
Here, the Legislature has declared the policy: that the power crisis on Long Island should be met by replacing LILCO with a public authority as power provider and it has made acquisition of any part of LILCO’s property contingent on LIPA’s becoming the power provider and being able to do so at lower rates. The Settlement Agreement implements the opposite policy — i.e., retaining and revitalizing the private utility — and disregards the express statutory conditions on the acquisition of LILCO property. The debatable questions as to which policy better serves the public interest are not before us. But the answer to the legal question is certain. If, as respondents contend it should be, the policy of the Legislature as set forth in the LIRA statute should be rejected and another substituted, it must be by legislative action. The Legislature’s policy cannot constitutionally be rejected and replaced by executive fiat.
II
The provision of the 1989 Settlement Agreement which mandates that Shoreham be decommissioned commands an "action” (ECL 8-0105 [4]; 6 NYCRR 617.2 [b]) requiring SEQRA compliance. Unquestionably, the decommissioning and disposal of Shoreham pose "significant environmental impacts” (ECL 8-0109 [2]). Respondents do not dispute this. Rather, they contend, and the majority agrees, that the decommissioning of the Shoreham facility is exempt from SEQRA compliance because it is authorized by section 1020-h (9) and therefore falls within the ministerial act exemption from SEQRA (ECL 8-0105). I disagree.
Contrary to the majority’s assertion (majority opn, at 415-416, 416) that decommissioning Shoreham is exempt from SEQRA because it is "mandatory”, an action is not exempt from SEQRA compliance as ministerial merely because it is legislatively mandated (see, Matter of Rye Town/King Civic Assn. v Town of Rye, 82 AD2d 474; Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd., 96 Misc 2d 1, affd 69 AD2d 320). To *430 be exempt, an act must be an official act "of a ministerial nature, involving no exercise of discretion” (ECL 8-0105 [5] [ii]) and "performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion” (6 NYCRR 617.2 [x]). For an act to be "of a ministerial nature”, it must appear that the Legislature has commanded that act and specified the standards for or methods of its implementation. In specifying both the result and the procedure by which it is to be achieved, the Legislature forecloses all opportunity for exercise of discretion by removing any "latitude of choice” regarding implementation (see, e.g., Matter of Filmways Communications v Douglas, 106 AD2d 185, 186 [issuance of a construction permit held ministerial because building code specified standards, which if met, required issuance of license]).
There are separate environmentally significant decisions of two different types involved in decommissioning Shoreham. First, the very decision of whether to decommission Shoreham —without consideration of the particular procedures to be employed — unquestionably involves questions of enormous environmental concern. Like the initial proposal to build a food processing plant (see, Bardon v Town of N. Dansville, 134 Misc 2d 927) or the initial creation of a sewer district to construct sewer facilities (see, Matter of Tri-County Taxpayers Assn. v Town Bd., 79 AD2d 337), the initial direction to go forward with the project, standing alone, poses concededly serious environmental problems regardless of what ultimately may be the steps taken or the procedures followed in carrying it out.
The second type of environmentally significant decision in closing Shoreham — once the determination to go forward has been made — entails the plans for decommissioning and the methods to be employed. That such decisions will undoubtably require separate SEQRA compliance — as respondents point out — does not diminish the environmental impact from the initial direction to decommission or obviate the necessity for SEQRA compliance with regard to it. Subsequent SEQRA compliance in making the decisions as to how a facility should be decommissioned will not cure the omission of SEQRA compliance with respect to the critical initial direction to decommission. Thus, this initial direction — itself environmentally significant — must be considered separately. The question before us is whether that decision, taken alone, is "of a ministerial nature” so as to be exempt (ECL 8-0105 [5] [ii]; 6 NYCRR 617.2 [q]).
*431 Respondents maintain that the "action” in question — the direction that Shoreham be decommissioned — is ministerial and therefore exempt because it is mandated by the LIPA statute. But the particular statutory provision (Public Authorities Law § 1020-h [9]) is not the sort of legislative direction on which a claim of ministerial action can be predicated. Section 1020-h (9) provides in pertinent part:
"As soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so * * * the authority shall forthwith close and decommission the Shoreham plant”.
The statute contains merely a flat, categorical direction that the ultimate end — the decommissioning of Shoreham — be accomplished. Far from preempting LIPA’s discretion, the statute actually affirms it. Section 1020-h (9) does not prescribe when, how, or under what safeguards the decommissioning is to be done and leaves entirely to LIPA the choice of the means and procedures for implementing the decommissioning mandate. The action commanded of LIPA — to decommission Shoreham as it sees fit — is, therefore, one which cannot be deemed ministerial. By no construction can it be "an action performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion” (6 NYCRR 617.2 [x]).
Moreover, language elsewhere in the LIPA statute compels the conclusion that the Legislature did not intend that any decommissioning of Shoreham done pursuant to section 1020-h (9) should be exempt from SEQRA. Section 1020-s contains a specific SEQRA exemption, but not for decommissioning Shore-ham. The SEQRA exemption in section 1020-s (2) is only for "[t]he issuance by the authority of its obligations to acquire the securities or assets of LILCO” or other "action of the authority to effect such acquisition.” The inference is plain that if the Legislature had intended to exempt other actions from SEQRA it would have said so (see, McKinney’s Cons Laws, Book 1, Statutes § 240 ["expressio unius est exclusio alterius”]).
The order and judgments of the Appellate Division should be reversed, with costs.
Chief Judge Wachtler and Judges Simons and Kaye concur with Judge Bellacosa; Judge Hancock, Jr., dissents and votes to reverse in a separate opinion in which Judges Alexander and Titone concur.
*432 In Matter of Citizens For An Orderly Energy Policy v Cuomo: Order affirmed, with costs.
In Matter of Dollard v Long Is. Power Auth.: Judgment affirmed, with costs.
In Matter of Nassau Suffolk Contr. ’s Assn. v Public Serv. Commn.: Judgment affirmed, with costs.

. Both the 1989 Settlement Agreement and the Long Island Power Authority statute call for the decommissioning of the Shoreham facility. Whether LIPA acquires LILCO and becomes the electric utility on Long Island as called for in the statute or Shoreham alone is transferred to LIPA under the Settlement Agreement, all agree that Shoreham will not be operated. The undisputed statements in the brief of the Public Service Commission are that LILCO under no circumstances will operate Shoreham and that "the outcome of [the] appeals [before the New York Court of Appeals] will have no effect on Shoreham’s disposition”. Moreover, on oral argument counsel for LILCO stated that the steps LILCO had already taken in dissembling the reactor were "irreversible” and "effectively foreclosed” the operation of Shoreham by anybody.

. Moreover, the references in the statute to rates charged by LILCO are subjunctive references to hypothetical rates for comparing the actual rates to be charged by LIPA as the power provider if acquisition goes forward (i.e., rates that "will result” [§ 1020-h (1) (b)]) with the hypothetical rates (i.e., rates that "would result if LILCO were to continue in operation” [id.] [emphasis added]). The LILCO rates which are hypothesized for purposes of comparison only, are based on the assumption that what is actually contemplated does not happen, i.e., that acquisition does not occur and that LILCO, not LIPA, remains the power provider.

. It is worth noting that the District Court interpreted the goal of the LIPA statute as "establishing a publicly-owned power authority to serve a particular service area in the hope that more reliable and more reasonably priced services for that area would result” (Long Is. Light. Co. v Cuomo, 666 F Supp 370, 405).